UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

AMANDA BALSCHMITER,

                    Plaintiff,

v.                                                    Case No. 13-CV-1186-JPS

TD AUTO FINANCE LLC.

                    Defendant.                        ORDER

The plaintiff, Amanda Balschmiter ("Balschmiter"), filed a putative class action complaint against TD Auto Finance LLC ("TDAF"), alleging that, as a non-customer of TDAF, the auto-dialed debt-collection calls TDAF placed to her cell phone[1]—and, presumably, to the cell phones of other non-customers—violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. (Docket #1).

Balschmiter filed a motion for class certification, pursuant to Federal Rule of Civil Procedure 23, on July 18, 2014. (Docket #31, #36). Balschmiter seeks to certify a class consisting of:

> All persons within the United States who, on or after October 21, 2009, received a non-emergency telephone call from or on behalf of TDAF to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice, who did not have a contractual relationship with TDAF.

(Docket #36 at 12).

Specifically, the plaintiff requests certification under Rule 23(b)(3) and 23(b)(2) or "certifying the equitable portion…of the case under Rule 23(b)(2) and the damages portion of the case under Rule 23(b)(3)." (Docket #36 at 26).

---

[1]As will be discussed further in the next section, the calls were related to a debt owed by Balschmiter's boyfriend, Victor Loshek. (Docket #36 at 8).

The plaintiff requests, in the alternative (if certification under Rule 23(b) is inappropriate), that an "issues class" be certified under Rule 23(c)(4). *Id.* at 27. TDAF filed a brief in opposition on August 29, 2014. (Docket #47). On September 22, 2014, Balschmiter filed a reply to TDAF's brief in opposition (Docket #56) and her objections to the expert testimony of Dr. Debra J. Aron ("Dr. Aron"). (Docket #54). TDAF replied to the plaintiff's objection to Dr. Aron's testimony on October 7, 2014. (Docket #58). The Court will now address the plaintiff's motion for class certification.

1. BACKGROUND[2]

1.1 Alleged TCPA Violations Against the Plaintiff

In April 2012, the plaintiff's boyfriend, Victor Loshek ("Loshek"), purchased a used car; Loshek's loan was serviced by TDAF and he was the only signatory on the loan. Loshek went into default on the loan in July 2012. In 2012 and 2013, Balschmiter called TDAF on Loshek's behalf to make payments on the loan, inquire about due dates, etc.;[3] Balschmiter did so to assist Loshek while he was at work.

The plaintiff, after making calls to TDAF on Loshek's behalf, began to receive autodialed debt-collection calls from TDAF regarding Loshek's loan.

---

[2]The Court's recitation of the facts is drawn from the parties' briefs and myriad other submissions related to the plaintiff's motion for class certification. For the sake of brevity, the Court will not cite to the record in this section, except when quoting the parties' filings.

[3]The plaintiff alleges violations of the TCPA for calls made by TDAF to two cell phone numbers she used. (Docket #36 at 8 n.3). The defendant has produced evidence that the plaintiff called TDAF, just in 2013, from four different cell phone numbers, some of which she does not recall. (Docket #47 at 47-48). For purposes of this order, this is a distinction without a difference, because receiving autodialed debt-collection calls on any one of those numbers is sufficient to allege a TCPA violation.

The parties dispute whether the plaintiff gave prior express consent—or *could* give prior express consent, for that matter—to receive these types of calls during her conversations with TDAF. TDAF's account notes for Loshek "reflect that Plaintiff acted on Loshek's behalf and was designated as a 'contact approved' noncustomer, meaning that both Plaintiff and Loshek authorized TDAF to speak with Plaintiff regarding the Loshek account." (Docket #47 at 11). TDAF's records also indicate that, at least for one particular number, the plaintiff gave consent to be called by TDAF at that number, and then revoked consent at a later date. Nevertheless, the plaintiff eventually changed her number in an attempt to avoid future calls, apparently to no avail.

### 1.2    TDAF's Debt-Collection Practices

TDAF uses a customer account servicing system ("CASS") to keep track of "a host of information about its relationship with its customers, including contact information,…payment history, notes memorializing contacts with the customer, and dialing fields to list telephone numbers associated with the account." (Docket #47 at 13). Initially, the CASS fields are populated with information provided by customers on their credit applications. However, the fields are often updated with newer information when customer service representatives speak with customers or "contact approved" individuals.

Germane to the case at hand, the CASS has six dialer fields for telephone numbers—"T1" through "T6"—which hold the borrower's home, work, and cellular numbers ("T1" to "T3") and the co-borrower's (if there is one) home, work, and cellular numbers ("T4" to "T6"). When autodialing customers for debt-collection, the CASS can only access the numbers in these fields. The plaintiff alleges that according to TDAF's own policy, non-

customer telephone numbers should never be entered into the autodialer fields. Those numbers may only be dialed manually, and are typically listed in the account notes.

As TDAF describes it, "contact approved" individuals—those who were noncustomers but consented to phone calls from TDAF—could end up in autodialer fields: "when TDAF identified a new number associated with an account—from a borrower, co-borrower, or contact approved—TDAF's policy required the customer service representative to manually dial the number to obtain consent to call that number *before* the number was placed in an autodialed field." (Docket #47 at 13). Further, a "contact approved" individual's consent is supposedly noted in the account notes of CASS, as well as the customer service representative's decision to move their number into one of the autodialer fields. An individual may revoke consent, according to TDAF (and its policy), whereby the number is removed from the autodialer fields.

TDAF states that in addition to its policies regarding autodialing, it "maintains quality assurance and control processes designed to monitor customer service representatives' compliance with these and other policies." (Docket #47 at 14). However, much of this auditing was related to the quality of their employees' interactions with customers; compliance with its cell phone policy was grouped in with those other customer service metrics and was not independently audited before October 2013. *See id.* ("Though TDAF initially grouped together cell phone compliance data with a range of other policy data, as of October 2013 TDAF began to document and review cell phone compliance data separately."). The plaintiff points out that this change in policy—monitoring cell phone compliance separately—began in the same month that this case was filed.

The parties dispute, not surprisingly, how compliant TDAF was with its own policies for handling cell phone numbers during the class period. *Compare* (Docket #36 at 6) (alleging pre-October 2013 compliance rates in two locations of 41% and 35.7%) *with* (Docket #47 at 26 n.7) ("Though Plaintiff claims TDAF ha[d] a '41% compliance rate' in May 2013," that rate "reflects TDAF's compliance with its internal policies (for example, greeting the caller properly, documenting the notes properly, following call procedures, etc.) and does not reflect…TDAF's rate of compliance with the TCPA."). TDAF does note that "[o]nce cell phone policy compliance was tracked separately from other data, TDAF consistently observed a 94% compliance rate." (Docket #47 at 14).

### 1.3 Balschmiter's Cell Phone Numbers in TDAF's CASS

As part of discovery TDAF produced a list of all of the telephone numbers it autodialed during the class period. Both of the cellular telephone numbers the plaintiff alleges received autodialed calls in violation of the TCPA were on that list. Further "TDAF customer Victor Loshek's account records show that a cellular telephone number belonging to Plaintiff was moved by TDAF…into the T1 dialer field of Mr. Loshek's account," subjecting her to autodialed debt-collection calls. (Docket #36 at 6). Again, as noted above, the parties dispute whether Balschmiter consented to—or could ever consent to—receiving the calls at issue.

### 2. OVERVIEW OF THE TCPA AND CLASS CERTIFICATION

### 2.1 The TCPA

The TCPA was enacted in 1991 "to address telephone marketing calls and certain telemarketing practices that Congress found to be an invasion of consumer privacy." *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 96 (N.D. Ill. 2013). The TCPA "generally prohibits autodialed calls to wireless phones,"

but "provides an exception for autodialed and prerecorded message calls…made with the prior express consent of the called party." *In Re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559 ¶ 9 (Jan. 4, 2008) ("2008 TCPA Order"); 47 U.S.C. § 227(b)(1)(A)(iii).[4]

In the debt-collection context, autodialed calls to "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party" and, therefore, are permissible. 2008 TCPA Order ¶ 9. The FCC elaborated that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *Id.*

The FCC's 2008 TCPA Order emphasized, however, that "prior express consent is deemed to be granted *only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed*." 2008 TCPA Order ¶ 10 (emphasis added); *see also Nigro v. Mercantile Adjustment Bureau*, No. 13-1362, slip op. at 7 (2d Cir. Oct. 16, 2014).

Further, the creditor carries the burden of demonstrating that the consumer provided prior express consent. 2008 TCPA Order ¶ 10 ("Should a question arise as to whether express consent was provided, the burden will be on the creditor to show that it obtained the necessary prior express consent."). That is because "creditors are in the best position to have records

---

[4] The Court is bound by all of the FCC's final orders relating to the TCPA. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010) (holding that under the Hobbs Act, the FCC's TCPA orders are binding).

kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications." *Id.*

### 2.2    Class Certification

Class action litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). The requirements for class certification are embodied in Federal Rule of Civil Procedure 23. A district court "may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b)." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012). On top of the Rule 23 requirements, class certification also requires, as a threshold matter, that the plaintiff prove that the class—and, by implication, the class definition—is "sufficiently definite that its members are ascertainable." *Id.* (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)); *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

"Rule 23 does not set forth a mere pleading standard," however. *Walmart Stores, Inc. v. Dukes*, — U.S. —, 131 S.Ct. 2541, 2551 (2011); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012) ("On issues affecting class certification,…a court may not simply assume the truth of the matters asserted by the plaintiff. If there are material factual disputes, the court must 'receive evidence…and resolve the disputes before deciding whether to certify the class.'") (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Thus, a party who seeks to certify a class under Rule 23 "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S.Ct. at 2551.

Accordingly, the plaintiff must prove each disputed requirement by a preponderance of the evidence.[5] *Messner*, 669 F.3d at 811.

While a district court "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits," *id.*, granting class certification is appropriate "only if, 'after a rigorous analysis,' the trial court is satisfied that the requirements of Rule 23 have been met." *Jamie S.*, 668 F.3d at 493 (quoting *Dukes*, 131 S.Ct. at 2551); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (recognizing that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question"). Inevitably, that "rigorous analysis" will sometimes involve delving into the merits of the plaintiff's case. *See Dukes*, 131 S.Ct. at 2551 ("Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

The Court will now turn to the implied and express requirements of Rule 23.

---

[5] The defendant's brief quotes *Jamison* for the proposition that ascertainability requires clear and convincing evidence. (Docket #47 at 15); *see Jamison*, 290 F.R.D. at 109 ("Therefore, Jamison has failed to establish by clear and convincing evidence that the class is ascertainable."). However, this conclusory statement was not a recitation of the law. And even if it could be interpreted as such, it misstates the law. *See Bayer*, 727 F.3d at 306 (stating that "a plaintiff must show, by a preponderance of the evidence, that the class is currently and readily ascertainable") (quoting *Marcus v. BMW of North Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (internal quotation marks omitted)). Indeed, the Court has not found any case law supporting the proposition that a higher evidentiary burden is necessary for ascertainability. It would be odd, indeed, to require a higher evidentiary burden for an implied requirement than for the express requirements. The Court does note that the *Jamison* court correctly stated the evidentiary burden for class actions is a preponderance of the evidence during its initial discussion of the law. *See Jamison*, 290 F.R.D. at 102 ("Whether a plaintiff has met his burden [for class certification] is measured by the 'preponderance of the evidence' standard.") (quoting *Messner*, 669 F.3d at 811).

### 2.2.1  Implied Requirement of Ascertainability

As earlier noted, "[o]ne threshold requirement is not mentioned in Rule 23, but is implicit in the analysis: that is, the plaintiff must demonstrate that the proposed class is 'adequately defined and clearly ascertainable.'" *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 Fed.Appx. 782, 787 (11th Cir. 2014) (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)) (internal quotation marks omitted).  While there is a dearth of case law from this circuit on the requirement, the Third Circuit recently "explained the concept of ascertainability at length for the first time." *Bayer*, 727 F.3d at 305 (citing *Marcus*, 687 F.3d at 592-95).  That explanation is instructive:

> The ascertainability requirement serves several important objectives. First, it eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members. Second, it protects absent class members by facilitating the best notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action. Third, it protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable.

*Marcus*, 687 F.3d at 593 (citations and quotations omitted).

In light of the foregoing, "[c]lass ascertainability is 'an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3).'" *Bayer*, 727 F.3d at 306 (quoting *Marcus*, 687 F.3d at 592-93). A plaintiff must show by a preponderance of the evidence that the proposed class is "currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 593; *see also Bridgeview Health Care Ctr. Ltd v. Clark*, No. 09-CV-5601, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011) ("To be ascertainable, a class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria.").

"A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Bayer*, 727 F.3d at 306; *see also In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008) ("A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient."). If it is impossible to identify class members "without extensive and individualized fact-finding or 'mini trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593.

Ascertainability is inexorably tied with the plaintiff's class definition. *See Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977) (noting that "whether the description of a class is sufficiently definite to permit ascertainment of the class members must, of necessity, be determined on a case-by-case basis"); *Oshana v. Coca Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Thus, courts must look to the class definition to determine, in part, whether the class is ascertainable.

Minor overbreadth problems "that do not call into question the validity of the class as a whole" are best served by "not deny[ing] class certification entirely but [instead allowing amendment of] the class definition as needed to correct for the overbreadth." *Suchanek v. Sturm Foods*, 764 F.3d 750, 757 (7th Cir. 2014). However, if "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824. There is no precise formula to determine "a great number," thus "[s]uch determinations are a matter of degree, and will turn on the facts as they appear from case to case." *Id.* at 825.

### 2.2.2  Rule 23(a) Requirements

#### 2.2.2.1  Numerosity

The first requirement of Rule 23(a) is that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A plaintiff does not need to "specify the exact number of persons in the class,…but cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity." *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (internal citations omitted). The Seventh Circuit has implied that even a class of forty may be sufficient to warrant class certification. *See Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006) (noting that "[s]ometimes 'even' 40 plaintiffs would be unmanageable"); *Costello v. BeavEx, Inc.*, No. 12-CV-7843, 2014 WL 1289612, at *8 (N.D. Ill. Mar. 31, 2014) ("A class consisting of more than 40 members generally satisfies the numerosity requirement of certifying a class action.").

#### 2.2.2.2  Commonality

The second requirement of Rule 23(a) is that "questions of law or fact common to the class" exist. Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157); *Jamie S.*, 668 F.3d at 497. The class's claims must "depend on a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Additionally, it is not the amount of common questions the class shares—even one will do--but whether classwide proceedings will "generate common answers apt to drive the resolution of the litigation." Richard A.

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009).

### 2.2.2.3  Typicality

The third requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality means that the class's claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of the other class members and…[the] claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (noting that this requirement ensures that "the interest of the named representative aligns with the interests of the class").

### 2.2.2.4  Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). While the adequacy and typicality requirements "tend[] to merge," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation marks omitted), the focus is on "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

### 2.2.3  Rule 23(b)(3) Requirements

Rule 23(b)(3) certification is appropriate when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). In short, the plaintiff must show predominance and superiority.

### 2.2.3.1  Predominance

The predominance requirement "goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). The requirement is related to commonality—in that common questions must exist classwide—but "the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 623-24. To meet this requirement, the plaintiff must show "common questions represent a significant aspect of [a] case and…can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (alterations in original) (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). However, predominance does not require that the plaintiff "prove that the predominating question will be answered in their favor." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, — U.S. —, 133 S.Ct.1184,1196 (2013).

Further, predominance is "a qualitative rather than a quantitative concept. It is not determined by simply counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Parko*, 739 F.3d at 1085. If the litigation will not be greatly simplified by resolution of a common issue, "the complications, the unwieldliness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Id.* Stated another way, predominance measures whether the litigation will be overly burdened by resolution of individual questions, which will substantially inhibit the quest for answers to common questions—the foundational pursuit of class action litigation.

### 2.2.3.2   Superiority

The second requirement under Rule 23(b)(3), superiority, is intended to ensure that classwide resolution truly would be an improvement over individual litigation. Thus, superiority, along with predominance, are intended "to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

### 2.2.4   Rule 23(b)(2) Certification Is Unavailable

The plaintiff requests certification under Rule 23(b)(2) in addition to, or in lieu of, certification under Rule 23(b)(3). (Docket #36 at 26). The Court can dispense with this request at the outset. Rule 23(b)(2) is unavailable in the instant case because in *Dukes*, the Supreme Court held that "claims for individualized relief…do not satisfy the Rule." *Dukes*, 131 S.Ct. at 2557 (explaining that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages").

Here, the TCPA provides statutory damages for each offense of the TCPA. Thus, permitting certification under Rule 23(b)(2) in TCPA cases would impermissibly allow "the monetary tail to wag[] the injunction dog." *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005); *see also Wolfkiel v. Intersections Ins. Svcs. Inc.*, No. 13-CV-7133, 2014 WL 866979, at *5 (N.D. Ill. Mar. 5, 2014) (finding certification under Rule 23(b)(2) inappropriate in TCPA case).

### 2.2.5   Rule 23(c)(4) Requirements

Rule 23(c)(4) provides "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The Seventh Circuit described this type of certification in *Carnegie*

*v. Household Intern, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). The Fifth Circuit has cautioned, however, that Rule 23(c)(4) cannot be used to manufacture predominance. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996); *see also Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) (explaining that "subsection 23(c)(4) should be used to separate 'one or more' claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met").

However, "Rule 23(c)(4)(A) does not create, in addition to the three types of class actions enumerated in Rule 23(b), a fourth type, the 'issue' class action." *In re Gen. Motors Corp. Dex-Cool Prods. Liab. Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007). "Rather, where class certification is sought as to issues under Rule 23(c)(4)(A), Rule 23(b)(3)'s requirements of predominance and manageability must be satisfied, and class certification must be denied where those requirements cannot be met." *Id.*

3.      DISCUSSION

The Court will first determine if prior express consent can be resolved on a class-wide basis. Then, the Court will analyze the effect of its prior express consent determination on the Rule 23 requirements—requirements that the plaintiff has the burden to prove before the Court may certify the putative class.

3.1      The TCPA's Prior Express Consent Requirement

Despite the FCC's 2008 TCPA Order explaining who may give prior express consent to receive autodialed debt-collection calls, which seems to hold that only the debtor can provide prior express consent—and, only

during the transaction that gave rise to the debt—the law on this subject is far from clear.[6]

It is no surprise then that the parties have spilled a lot of ink on the subject. In order to determine if prior express consent is capable of classwide

[6]*See, for example, Mais v. Gulf Coast Collection* Bureau, 944 F.Supp.2d 1226, 1239 (S.D. Fla. 2013) (holding that the FCC's TCPA 2008 order was not entitled to deference, finding its construction of the TCPA "inconsistent with the statute's plain language because it impermissibly amends the TCPA to provide an exception for 'prior express *or implied* consent'") *rev'd* 768 F.3d 1110; *Zyburo v. NCSPlus*, No. 12-CV-6677, 2014 WL 4536932, at *3 (S.D.N.Y. Sept. 15, 2014) (same).

Much of the confusion is directly attributable to the FCC's own guidance on the TCPA, which appears to be allergic to brevity and clarity, *see, e.g., Baird v. Sabre, Inc.*, 995 F.Supp.2d 1100, 1106 (C.D. Cal. 2014) (noting that part of the 1992 TCPA Order relating to prior express consent "is not a model of clarity"); and the agency's leader recently conceded as much:

> Over time, as the FCC and the courts have interpreted the TCPA, business models and ways of communicating with consumers have also changed. As a result, the rules have become complex and unclear.
>
> …
>
> Indeed, the problems caused by this lack of clarity are evidenced by an increasing number of TCPA-related law suits and a growing backlog of petitions pending at the FCC.
>
> …
>
> That is why the FCC needs to address this inventory of petitions as soon as possible. Through this process, the FCC has the opportunity to answer important questions and provide much needed guidance on a variety of TCPA issues, including…whether there is liability for calls made to reassigned phone numbers, whether consent can be obtained through intermediaries, [and] whether consent can be inferred from consumer behavior or social norms…. Tackling this backlog in a comprehensive manner will help restore certainty…
> The FCC also needs to take a hard look at its own precedent. Some of these prior interpretations of the TCPA, while well-meaning, may have contributed to the complexity by enlarging the scope of potential violations.

*See* Michael O'Reilly, *TCPA: It is Time to Provide Clarity*, Official FCC Blog, http://www.fcc.gov/blog/tcpa-it-time-provide-clarity (March 25, 2014)

resolution, the Court must delve into the merits of the parties' arguments and the relevant law. The Court will "take a peek at the merits" because, as the parties argue, resolution bears directly on Rule 23 matters.[7] *See Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *Szabo*, 249 F.3d at 677; *Amgen*, 133 S.Ct. at 1194-95.

The plaintiff asserts that "the TCPA does not permit a defendant to obtain prior express consent to autodial *non-customers* [for debt-collection purposes] at all." (Docket #36 at 2). So, the argument goes, the FCC has implicitly established a non-customer/customer dichotomy under the law. (Docket #56 at 7) (arguing that "prior express consent must be obtained from 'the consumer'— not '*a consumer*' or '*any consumer*,' but '*the consumer*'— whose account the debt collector is calling about"). Additionally, the plaintiff argues that the relevant transaction for purposes of prior express consent under the TCPA "is the origination of the loan or debt, and *only* the origination of the debt." *Id.* at 21. Thus, "[s]ome later encounter relating to the original transaction, even if it involved a caller providing a cell phone number, does not constitute prior express consent to autodial the number received at the later stage." *Id.*

---

[7]The parties have attempted to tee up resolution of this issue on the merits by extensively briefing it at the class certification stage. (*See* Docket #47 at 25) (arguing that the plaintiff's class certification motion "relies on the merits of…[a] fundamental legal argument" and thus the Court must address the merits to determine if the requirements of Rule 23 are satisfied); (Docket #56 at 3, 13) (arguing, on the merits, that the defendant "has no valid prior express consent defenses" classwide and thus this case is distinguishable from decisions that hold individualized defenses precluded class certification). Delving into the merits is permissible when the parties' arguments effectively "tie the judge's hands by making allegations relevant to both the merits and class certification." *Szabo*, 249 F.3d at 677.

The defendant argues, conversely, that the plaintiff's customer/non-customer dichotomy is "predicated on a misreading of the law," because "neither the text of the TCPA, [nor] the FCC's rulings, nor the case law make [such a] distinction." (Docket #47 at 22). Instead, the defendant argues that the FCC's *amicus* letter brief in *Nigro*—citing language in a 2012 FCC Order relating to the TCPA—"reaffirmed that a noncustomer can verbally give consent to be autodialed." (Docket #47 at 23); *see* FCC Letter Brief as *Amicus Curiae* at 10, *Nigro v. Mercantile Adjustment Bureau*, No. 13-1362 (2d Cir. Oct. 16, 2014); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 27 F.C.C. Rcd. 1830, 1839-40 ¶ 25 (2012) ("2012 TCPA Order"). Finally, the defendant asserts that prior express consent involves issues of scope, revocation, and context which effectively distinguish *Nigro* from the instant case.

The Court notes, at the outset, that the plaintiff's argument that the origination of the debt is the only time a consumer may provide prior express consent remains an open question. The FCC's rulings do not expressly state that a consumer could *never* consent to debt collection calls on a number provided to the creditor *after* the origination of the debt, and at least one court has held otherwise. *See Sartori v. Susan C. Little & Assoc., P.A.*, 571 Fed. Appx. 677, 683 (10th Cir. 2014) (upholding summary judgment against plaintiff in TCPA case where cell phone number was provided to the creditor over a year afterwards); *cf. Soppet v. Enhanced Recovery*, 679 F.3d 637, 641 (7th Cir. 2012) (noting that a hypothetical consumer "could consent expressly to receive calls at his *current* Cell Number, even if that number changes…"); *but cf. Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409, 420-21 (E.D.N.Y 2013) (rejecting the contention that "a grant of consent to be called at a prior cell phone number necessarily denotes express consent to be called

at any subsequent cell phone number" the creditor may uncover using skip-tracing or other means).

The language of the 2008 TCPA Order cuts against the plaintiff's argument—namely, the meaning of the phrase "during the transaction that resulted in the debt owed." 2008 TCPA Order ¶ 10. One definition of "transaction" is: "the act or process of doing business with another person, company, etc." Mirriam-Webster's Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/transaction.[8] One reasonable interpretation of the FCC's use of "transaction," then, is that during the time the consumer is still in the "process of doing business" with the creditor—i.e. by making payments, inquiring about the debt, etc.—the consumer's

---

[8] *See also In Re Enron Creditors Recovery Corp.*, 422 B.R. 423, 436 (S.D. N.Y. 2009), which states:

> Both Webster's and Black's define the word "transaction" in extremely broad terms. Black's Law Dictionary explains that a "transaction" is: "The act or instance of conducting business or other dealings"; "Something performed or carried out; a business agreement or exchange"; and even more broadly as "Any activity involving two or more persons." Black's Law Dictionary 1535 (8th ed. 1999). Likewise, Webster's states that a "transaction" is, in relevant part, "something that is transacted, esp. a business agreement," and further defines "transact" as "to carry on or conduct (business negotiations, etc.) to a conclusion or settlement." Webster's College Dictionary 1415 (1991).

provision of a number to the creditor can express consent to be autodialed at that number.[9]

The plaintiff's interpretation also appears to conflict with the 2008 TCPA Order's use of the phrases "in connection with an existing debt" and "regarding the debt"; both phrases could be read to permit provision of debtor's cell phone numbers *after* origination of the debt. *See* 2008 TCPA Order ¶ 1 ("In this ruling, we clarify that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor *in connection with an existing debt* are permissible as calls made with the 'prior express consent' of the called party."); *id* ¶ 14 (stating similarly that "creditors and debt collectors may use predictive dialers to call wireless phones, provided the wireless phone number was provided by the subscriber *in connection with the existing debt*"); *Moore v. Firstsource Advantage, LLC*, No. 07-CV-770, 2011 WL 4345704, at *10 ("it would strain logic to conclude that a debtor's voluntary provision of a contact number at the time an account is opened would constitute 'prior express consent' to be called at that number, but that the equally voluntary provision of a contact number sometime after the account is opened would not"); *Hill v. Homeward Residential, Inc.*, No. 13–CV–388, 2014 WL 4105580, at *6 (S.D. Ohio Aug. 19, 2014) (same); *cf.* FCC Letter Brief at 11 (declining to take a position about whether consent was

---

[9]The Second Circuit left open the possibility that the word "transaction" could be read in such a way. *See Nigro*, slip op. at 7 n.4. The Court stated:

> We do not decide what the outcome would be if a consumer were to open an account with a creditor and initially provide only his home phone number but later…provide a wireless number. Whether a subsequently given phone number is given as part of a continuing 'transaction,' or a transaction separate from the initial one that 'resulted in the debt owed,' is a question for future courts. Here, Nigro sought to close the account, not service it. In no sense was he incurring a debt.

*Id.*

possible if a formal representative of the estate provided a number regarding a "*previously incurred*, but currently pending, bill against the estate").

Finally, nowhere in the 2008 TCPA Order does the FCC state particular records *must* be produced to show the consumer provided prior express consent, as the plaintiff suggests. Instead the 2008 TCPA Order merely provides examples of records that *could be used. See* 2008 TCPA Order ¶ 10 (stating that records "*such as* purchase agreements, sales slips, and credit applications" can prove consent);[10] FCC Letter Brief at 10 (stating that "[t]he provision of a telephone number is not the only method of conveying prior express consent to receive debt collection calls," "an individual" can consent, "for example," orally or in writing).

In light of the foregoing, the Court cannot agree that provision of a cell phone number to a creditor at a time other than during the origination of the debt *could never* suffice to show prior express consent. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 ("Pursuant to the [2008 TCPA] FCC ruling, *prior express consent is consent to call a particular telephone number in connection with a particular debt that is given before the call in question is placed.*") (emphasis added).[11]

---

[10]The Court does note that the documents the FCC lists are all typically provided at the origination of a debt. However, drawing substantive conclusions from its choice of examples would be ill-advised.

[11]The Ninth Circuit's opinion in *Meyer* is quite telling, considering that the opinion was later amended to *remove* language supportive of the plaintiff's position. *See Meyer v. Portfolio Recovery Assocs., LLC*, No. 11-56600, slip op at 12258 (9th Cir. Oct. 12, 2012) ("Pursuant to the FCC ruling, prior express consent is deemed granted only if the wireless telephone number was provided by the consumer to the creditor, and only if it was provided at the time of the transaction that resulted in the debt at issue. Thus, consumers who provided their cellular telephone numbers to creditors after the time of the original transaction are not deemed to have consented to be contacted at those numbers for purposes of the TCPA.") (internal citation omitted).

Thus, the Court must address the much larger question before it. To wit: Can a non-debtor provide prior express consent to receive autodialed debt-collection calls regarding another person's debt? A question the plaintiff urges the Court to answer in the negative. The Court now turns to that question.

At the outset, the Court notes that the plaintiff's argument that "[i]t would be the rare individual who would knowingly consent to receive automated calls on his or her cell phone about someone else's debt" is well taken. (Docket #56 at 8). Indeed, the Second Circuit issued an opinion—after full briefing on class certification here—that appears to support the plaintiff's position in this case. In *Nigro,* after soliciting an *amicus* letter brief from the FCC, the Second Circuit held that a non-debtor who called on behalf of a debtor—and in the process voluntarily gave his cell phone number to the creditor (without limitation)—did not consent to automated calls regarding the debt. *Nigro*, slip op. at 7.

There, the plaintiff called a power company after his mother-in-law passed away to discontinue the service at her apartment. *Id.* at 3. During the phone call the power company asked the plaintiff to provide his number after the company "told [him] that a phone number was necessary to disconnect service." *Id.* Unbeknownst to Nigro, his mother-in-law's account still had an unpaid balance of $68; since he disconnected service, the amount went unpaid. *Id.* The power company later hired a debt collection company to recover the money and it called him—using an automated system—seventy-two times over nine months. *Id.* The district court granted summary judgment in the debt collector's favor, holding that Nigro consented to the calls when he provided his number to the power company. *Id.* at 4.

In reversing the district court, the Second Circuit essentially restated the substance of the FCC's amicus letter, which in large part merely echoed the emphasis in the 2008 TCPA Order that a consumer provides prior express consent only if the wireless number is "provided during the transaction that resulted in the debt owed." *Id.* at 5-6. Thus, the Court held that Nigro did not consent because his number was not provided during the transaction that gave rise to the debt. *Id.* at 7 (noting that Nigro "provided his number long after the debt was incurred and was not in any way responsible for—or even fully aware of—the debt"). Additionally, and for the same reason, the court found that Nigro was not a "consumer,"[12] but a third party. *Id.*

Standing alone, *Nigro* could be read, quite reasonably, to imply that Nigro could not have given consent to receive autodialed calls even if he had expressly stated as much when he called the power company to terminate the service. However, the FCC's letter brief, solicited by the Second Circuit, does not foreclose this possibility. The Court is permitted to give deference to the FCC's *amicus* letter brief, "to the extent it has the power to persuade."

---

[12] The FCC's *amicus* letter did not actually state that under the TCPA, Nigro was also not the "consumer." This is probably in part because the question posed by the Court to the FCC already presupposed the answer was "no." *See* FCC Letter Brief at 2 (beginning the question presented to the FCC by explicitly stating that the person referred to in the question "is not a consumer"). Instead, the FCC suggested that "because Nigro did not supply his cellular number during 'the transaction that resulted in the debt owed,'" the Court need not reach whether the case involved the provision of a cellular number "by the consumer to the creditor." *Id.* at 9 n.3.

*Black v. Educ. Credit Mgmt. Corp.*, 459 F.3d 796, 800 (7th Cir. 2006) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[13]

First, as the defendant states, the *Nigro* case presented the FCC with an opportunity to expressly state that a non-debtor could *never* consent to receiving debt collection calls regarding another person's debt. But it did not.

While the letter reiterates much of the discussion above, it also states, pursuant to its 2012 TCPA Order, that "[t]he provision of telephone number is not the only method of conveying prior express consent to receive debt collection calls. An *individual* may, for example, provide such consent by means of written or oral communication." FCC Letter Brief at 10. In the Court's view, the FCC's use of "individual" instead of "the consumer," cannot be reconciled with the plaintiff's position.[14]

Additionally, the FCC poses, but then takes no position on "whether there would have been consent had [the debt collector] been furnished with the telephone number of the administrator or other formal representative of a decedent's estate" regarding a previously incurred debt. FCC Letter Brief at 10-11. This implies, of course, that a non-debtor—acting as an agent of the

---

[13]The Court declines to give the amicus letter *Chevron* deference, as the plaintiff requests. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This decision has nothing to do with the substance or merits of the FCC's letter; rather, *Chevron* deference rarely applies to agency *amicus* letters. *Matz v. Household Int'l Tax Reduction Inv. Plan*, 388 F.3d 570, 573-74 (7th Cir. 2004); *Keys v. Barnhart*, 347 F.3d 990, 993-94 (7th Cir. 2003). Thus, the Court finds it prudent to give the *amicus* letter the same deference the Second Circuit afforded it. *See Nigro*, slip op at 5 ("In their submissions responding to the FCC's brief…neither party asks us to give [*Auer*] deference to the agency. Plaintiff merely asks us to apply the weaker 'Skidmore deference.' This deference we grant, without deciding whether *Auer* should apply.") (internal citation omitted).

[14]To be sure, the FCC's letter cannot—as a precedential matter—trump the plain language of its final orders on the TCPA. Whether it actually does so—or is merely an application of its 2012 rulemaking—is not for this Court to decide.

debtor—*might be able to* consent to debt collection calls. And, at least one circuit court has found that agency principles may indeed apply to prior express consent under the TCPA.[15] *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1253-54 (11th Cir. 2014) (applying common law of consent to TCPA and suggesting that a defendant might be able to prove prior express consent by demonstrating that "an agency relationship" existed between housemates permitting the agent to consent to autodialed debt collection calls on the other's behalf"); *cf. Mais v. Gulf Coast Collection Bureau*, 768 F.3d 1110, 1123 (11th Cir. 2014) (holding wife's disclosure of husband's cell phone number on hospital admission form was prior express consent to receive debt collection calls pursuant to the FCC's 2014 TCPA ruling permitting "consent obtained and conveyed by an intermediary") (citing *In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Petition*, 29 F.C.C Rcd. 3442, 3447 (2014)); *cf. Gager v. Dell Fin. Svcs.*, 727 F.3d 265, 271 (3d Cir. 2013) (holding that common law concept of consent applied to TCPA, therefore allow[ing] consumers to revoke their prior express consent").

The FCC's amicus letter also notes that "[a]n individual's consent, once obtained, is 'not unlimited.'" FCC Letter Brief at 4. The scope of the consent is based upon the facts of each situation. *Id.* (citing *In Re GroupMe*, 29 F.C.C Rcd 3442, 3446 ¶ 11). Applying the foregoing to the *Nigro* facts, the FCC stated that "voluntary provision of his cellular telephone number…for

---

[15] The FCC raises a related concept—"actual or apparent authority"—without making a formal finding in its 2014 TCPA ruling. *See In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Petition*, 29 F.C.C Rcd. 3442 ¶ 14 n.34 (2014) ("To the extent that comments are intended to suggest that we should interpret the TCPA as permitting someone other than the consumer, such as someone claiming actual or apparent authority, to provide prior express consent of the consumer, we make no such finding."). The FCC notes that "[a]ddressing the issue may require consideration of agency and guardianship principles…to determine what may constitute a consumer's prior express consent." *Id.*

the 'limited purpose' of service termination did not convey his consent to receive calls 'that go beyond th[at] limited purpose.'" FCC Letter Brief at 9 (quoting 2012 TCPA Order, 27 F.C.C Rcd. 1830, 1839-40 ¶ 25).

The FCC's language, above, sheds little light on the question before the Court; if anything, it merely makes things murkier. Namely, if Nigro called for a purpose other than closing the account, say to make a payment, would that: (1) be "a transaction" or part of "the transaction"; (2) constitute prior express consent; (3) be evidence that he "provide[d] consent by means of…[an] oral communication"; (4) be evidence that he "otherwise had responsibility for [the] debt"; or (5) constitute "other evidence showing Nigro consented to the debt collection calls at issue?" *See generally* FCC Letter Brief.

The Court need not answer any of these questions at this juncture. It is enough that they exist, even after the FCC's *amicus* letter brief in *Nigro*. Taken together with the unsettled jurisprudence regarding consent under the TCPA,[16] and the lack of Seventh Circuit guidance on this issue, then, the Court finds it wise to rely on the "old saw…that lawyers and judges 'never say never.'" *United States v. Flores*, 985 F.2d 770, 783 n.27 (5th Cir. 1993). Thus, the Court declines to find that a non-debtor could *never* consent to debt-collection calls regarding another individual's debt.

To be clear, the Court is not ruling that TDAF can or will ultimately succeed on the merits of its arguments. That is a decision best left for determination after class certification. The Court's discussion above is part and parcel of the "rigorous analysis" that is required of the Court under Rule

---

[16]Notably, a handful of district courts have granted motions to stay TCPA cases involving "prior express consent" pursuant to the primary jurisdiction doctrine; the courts have done so in light of the many pending petitions before the FCC, some bearing directly on prior express consent to receive debt collection calls. *See, e.g.*, *Gusman v. Comcast Corp.*, No. 13-CV-1049, 2014 WL 2115472, at *4 (S.D. Cal. May 21, 2014) (collecting cases).

23 and *Dukes*. Indeed, peeking at the merits on this issue—the issue the plaintiff argues is determinable class-wide—is necessary because it is the "one substantive issue [that] will undoubtedly determine how a trial on the merits will be conducted if the proposed class is certified." *Gene & Gene LLC v. Biopay*, 541 F.3d 318, 327 (5th Cir. 2008).

3.2 The Plaintiff's Motion to Exclude Dr. Aron's Testimony

Prior to conducting its Rule 23 analysis, the Court must address the plaintiff's objections to the testimony of Dr. Aron. District courts, as gatekeepers, must "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Seventh Circuit has held that "when expert testimony is…critical to class certification," a district court "must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Id.* at 812 (citing *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010)). Testimony is"critical" if it is "important to an issue decisive for the motion for class certification." *Messner*, 669 F.3d at 812. A ruling on the expert testimony must be made "without regard to whether the district court ultimately grants or denies [the class certification] motion." *Id.* at 813.

"Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), expert testimony is admissible only if (1) the expert testifies to valid technical, scientific, or other specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner*, 669 F.3d at 811-12. A district court's *Daubert* analysis has been termed "crucial"; therefore, its findings must be on the record and offer more than conclusory statements. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006). However, the court need not analyze *Daubert* mechanically,

as long as the Court adequately performs the analysis and considers all of the essential *Daubert* factors. *Id.*

Turning to the specifics the Court is charged with then, "the [Court] must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Federal Rule of Evidence 702). The Court must focus "solely on the principles and methodology, not the conclusions that they generate," *Daubert*, 509 U.S. at 594-95; it is reserved to the trier of fact "to evaluate the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013).

The plaintiff has objected to Dr. Aron's testimony regarding the reliability of the plaintiff's proposed method—using reverse lookups—to ascertain class members' identities from a list of cell phone numbers. Dr. Aron's testimony, in summary, asserts that the plaintiff's procedure for ascertaining class members "would lead to substantial errors of both over-inclusion and exclusion that could significantly exceed the number of correctly-identified class members according to Plaintiff's theory of liability." (Docket #54 at 9). She reaches this conclusion by utilizing a mathematical formula that uses as its variables: (1) "sample" error rates in reverse lookup providers; and (2) the potential percentage of individuals that were called by TDAF who ultimately end up in the class (according to the plaintiff's theory of the case). (Docket #58 at 7).

Before turning to its *Daubert* analysis, the Court will briefly summarize the plaintiff's objections to Dr. Aron. The plaintiff alleges that: (1) "Dr. Aron's opinion is not based on specialized knowledge, but instead on an *ad hoc* and

cursory investigation of the topic," (Docket #54 at 2-3); (2) her opinion uses conjecture and not "verifiable, reliable data," *id.* at 3; and (3)the formula she uses to calculate potential error rates "is wholly reliant on its data inputs in order to be valid, and she cannot substantiate those inputs." *Id.* As the plaintiff sees it, "TDAF hired the equivalent of a professor of fluid dynamics when what it needed was a plumber." *Id.* at 1.

A court is to "consider a proposed expert's full range of practical experience as well as academic or technical training." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). So,"[t]he question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). The question Dr. Aron has opined on is whether the plaintiff's method for ascertaining the putative class members from a list of wireless numbers is reliable.

Dr. Aron has a Ph.D in economics from Northwestern. (Docket #44 at 20). Her experience is in the general area of telecommunications and her research and consulting work focuses on "telecommunication issues, the economics of regulation, innovation, incentives, and pricing"; she has published articles on those subjects in various peer-reviewed journals. *Id.* at 2.

The plaintiff seizes on Dr. Aron's general telecommunication experience, and the fact that she has "never performed a reverse look-up beyond a few isolated names," as evidence that her "specialized knowledge" is not meaningful to the question presented to her. (Docket #54 at 4). Namely, "anyone could duplicate Dr. Aron's concrete 'research' into reverse lookup services with a few hours and access to a computer." *Id.* The defendant responds by characterizing this argument as "nonsensical." (Docket #58 at 10). The Court agrees.

The fact that Dr. Aron has not performed extensive lookups herself does not mean that she is unqualified to opine on ascertainability issues. *See Nutrasweet v. X-L Eng'g Co.,* 227 F.3d 776, 790 (7th Cir. 2000) (noting that "an expert is not always required to personally perceive the subject of his analysis"). She is not testifying about how reverse lookups work nor is she even offering an opinion about the *actual* error rate in the database the plaintiff has chosen to use. (Docket #44 at 10). Instead, she offers what amounts to a mathematical formula to predict—using *potential* error rates—what effect those error rates would have on the accuracy of the plaintiff's methodology. It strains credulity to argue that Dr. Aron, an economist who has done empirical research, is not qualified to offer a mathematical formula. However, with that said, the formula must nonetheless be testable and produce consistently accurate results. *See Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). But the plaintiff does not even attempt to argue that Dr. Aron's formula is scientifically invalid or outside of her area of expertise. (Docket #54 at 8).

The plaintiff's last two arguments—that Dr. Aron uses unreliable data and conjecture and, thus, her formula is "junk in junk out"—are equally unavailing. To begin, both of the plaintiff's arguments rest on the observation that "[t]o be of any assistance to the Court, an expert opinion would need to demonstrate reliably *how large* the errors are, and *to what extent* those errors will impact the ultimate result," *id.* at 9, and the conclusion that Dr. Aron's model is not reliable because the "input variables can only be guessed at." *Id.* at 8. To be sure, "[a]n expert must offer good reason to think that [her] approach produces an accurate estimate." *Zenith*, 395 F.3d at 419. However, the gravamen of the plaintiff's argument against Dr. Aron—styled as an objection under *Daubert*—is about the quality of her data and conclusions, which is a determination left to the trier of fact. *Goodpaster*, 736 F.3d at 1068;

*see also Brand v. Comcast Corp., Inc.*,No. 11-CV-8471, 2014 WL 3056541, at *
(N.D. Ill. July 5, 2014) (explaining that "weighing the persuasiveness of an
expert's report is not an appropriate undertaking for a court considering
whether to allow the expert to testify").

Dr. Aron's testimony is not unreliable, does not rest on a faulty
premise, nor does it employ flawed methodology. First, both parties concede
that *none* of the reverse lookup providers publish data on the accuracy of
their services. Indeed, the plaintiff's own expert merely offered a guess that
20% of the results would be inaccurate and that the percentage might go up
for those defaulting on debt. Without hard percentages, Dr. Aron chose to
use sample percentages of 10%, 20%, and 30%, based on the plaintiff's
expert's testimony and the testimony of other experts in similar cases. This
is not improper. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir.
2000) (stating that expert testimony may rely on the opinions or data of
others unless the testifying expert's opinion is too speculative or the
underlying basis is faulty).

Second, the plaintiff's objection to the over-inclusive and under-
inclusive errors projected by Dr. Aron's formula (the other variable) obscures
a larger issue. Namely, the plaintiff has failed to produce evidence to show
that these errors would not occur. In fact, the plaintiff has not produced any
evidence showing that—for a sample of the list—her methodology is
accurate. Left with imperfect information, Dr. Aron again provided three
sample percentages and projected the overall reliability of the names that the
plaintiff's methodology would produce. Again, the plaintiff does not
question Dr. Aron's formula, but only that its results are not helpful because
no one knows the correct data points. This is an untenable position. The
plaintiff cannot claim to have an accurate methodology, with no evidence in
support of that claim, while simultaneously decrying the defendant's expert

for attempting to quantify *possible* outcomes based on the limited information that does exist.

To be sure, "[e]xperts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Corp. v. Joiner*, 522 U.S. 136, 146 (1997). Dr. Aron's report and testimony rely on neither *ipse dixit* nor a range of possibilities that raises the "speculative" flag high in the air. To the extent that Dr. Aron's percentages are unverifiable at this point, that fact can be attributed to evidentiary shortcomings created by the plaintiff. The Court is well versed in the difference between theoretical probabilities and empirical evidence. Those are concerns about the weight of the testimony, not its admissibility. Dr. Aron's testimony will be admitted and the Court will give it the weight it is due in light of the facts of this case.

### 3.3    Class Action Requirements

#### 3.3.1    Implied Requirement of Ascertainability

The Court has serious reservations about the plaintiff's method to ascertain the putative class members. Ascertainability in this case is about "identifying and providing notice to the class members as individuals, not merely numbers on a list." *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 473 (S.D. Cal. 2014). The plaintiff has proposed using a reverse-lookup provider to ascertain class members. But both parties' experts agree that there is no reverse-lookup provider that can reliably provide subscriber information at a specified date in the past. Thus, this method presents a two-fold problem in light of: (1) the Seventh Circuit defining "called party"—*i.e.*, who may bring a claim under the TCPA—as "the person subscribing to the called number *at the time the call is made*," *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012)(emphasis added); and (2) the plaintiff's expert's

concession that reverse-lookup services can be inaccurate and the accuracy goes down in the debt-servicing population—because, presumably, those individuals often switch numbers to avoid debt-collectors,[17] just as the named plaintiff did here.

Therefore, "new persons who do not belong in the class might now own numbers encompassed by the class, and persons who should be in the class may no longer own the number." *Microsoft*, 297 F.R.D. at 473. These problems of over-inclusion and under-inclusion are the direct result of a class definition that spans over five years. *Id. (*noting that "because more than five years have passed, it is likely that many members of the proposed class have changed their numbers"); *Bates v. Dollar Loan Ctr., LLC,* No. 13-CV-1731, 2014 WL 5469221, at * 3 (D. Nev. Oct. 28, 2014) (expressing concerns about ascertainability in a non-reverse lookup case with class period of five years).

*Jamison*, which the plaintiff goes to great lengths to distinguish, involved a class that only covered "four years-worth of alleged telephone calls" and the court found reverse-lookups insufficient because "[t]he current subscribers of the cellphone numbers that were called over that period are likely not to be the same people as who were the subscribers when the calls were made." *Jamison*, 290 F.R.D. at 109. Moreover, in *Jamison* the plaintiff proposed reviewing the defendant's records to associate numbers with names, and the court still declined to certify the class. The plaintiff, here, has proposed no alternative methods besides reverse-lookups to ascertain class members. It is unclear if there are even alternative—and sufficient— methods to do so. *See Microsoft*, 297 F.R.D. at 473 (noting that after five years and "in light of the record retention policies of some of the major cellular

---

[17]Financial hardship may also force an individual to change numbers. The Court is mindful that the class period in the instant case also happens to coincide with the post-2008 economic downturn; perhaps this makes the likelihood of changed wireless numbers even higher.

service providers, it is likely that even subpoenaing the cellular service providers will not yield the necessary identification and contact information").

The death knell for the plaintiff's case is that the Court was unable to find *any* decision involving such a large window of time where ascertainability was met solely based on reverse-lookups. *See, e.g., Stemple v. QC Holdings*, No. 12-cv-01997-BAS(WVG), 2014 WL 4409817, at *8 (S.D. Cal. Sept. 5, 2014) (holding class ascertainable when calls occurred over four years because reverse-lookups were used in conjunction with loan applications). And, not surprisingly, the plaintiff does not cite to one.

The plaintiff's attempts to analogize the instant case to *Birchmeier v. Carribean Cruise Line, Inc.*, No. 12 C 4069, 2014 WL 3907048, at *1 (N.D. Ill. Aug. 11, 2014), are unconvincing. While class certification was granted in *Birchmeier* and reverse-lookups were to be used, they were also to be used in conjunction with obtaining contact information from "the telephone carriers themselves." *Birchmeier*, 2014 WL 3907048, at *5. Here, only reverse-lookups are proposed. More importantly, the class in that case involved *both wireless numbers and landline numbers. Id.* In this case, only wireless numbers are involved. Finally, the class period in *Birchmeier* covered an extremely limited period: one year, between August 2011 and August 2012. *Id.* at *2. Here, instead of a one year period to nail down, there is a *five* year period.

In light of the foregoing, the Court must find that the class is not ascertainable. *See Bayer*, 727 F.3d at 306 ("A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient."). The Court will continue its Rule 23 analysis, nonetheless, to highlight that ascertainability is not the only reason class certification should be denied.

### 3.3.2   Numerosity

The plaintiff has not specified how many individuals will be in the class. However, "a class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable." *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489,492 (7th Cir. 2014). During discovery, the defendant produced a list of all unique phone numbers TDAF autodialed during the class period. Of those numbers, 752,371 were wireless numbers. As the plaintiff states, if even 1% of those numbers fit within her class definition— 7,500 or so—numerosity is satisfied. The defendant has raised no argument to the contrary. Accordingly, the Court finds that the numerosity requirement has been met.

### 3.3.3   Commonality and Typicality

The plaintiff submits that the class-wide common issues in this case are: (1) "whether automated calls by TDAF to non-customers are in violation of the TCPA"; (2) "under what circumstances, if any, may a non-customer provide 'prior express consent' to be called by TDAF via automated means"; (3) "whether…class members are entitled to statutory damages under the TCPA"; and (4) if TDAF's calls do violate the TCPA, were "TDAF's calling activities…'willful' or 'knowing' violations of the TCPA," entitling the class members to treble damages. (Docket #36 at 16-17).

First, the Court notes that "[t]he commonality requirement is generally satisfied by a common nucleus of operative facts." *Thompson v. Ret. Plan for Emps. of S.C. Johnson & Sons, Inc.*, 265 F.R.D. 405, 410-11 (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)). Here, the Court finds that TDAF's debt collection practices do raise common questions across the class. The defendant attempts to argue that its consent defense is not capable of classwide resolution; on that point, which will be discussed further under the

Court's predominance analysis, the defendant is correct. However, the presence of individualized questions is inevitable. *See Messner*, 669 F.3d at 815 ("Individual questions need not be absent. [Rule 23] itself contemplates that such individual questions will be present."). At bottom, the defendant's arguments conflate predominance with commonality. The standard for commonality is quite low, requiring only that common questions exist across the class. The Court finds the commonality requirement has been met.

Typicality is also not a demanding standard. It merely requires that the representative parties' claims and defenses are typical of the class members. Fed. R. Civ. P. 23(a)(3). The plaintiff's claims are for TCPA violations and the class's claims will surely be the same; thus, typicality is met as to the claims. The defendant asserts that because "TDAF can assert a host of unique defenses" against the plaintiff, however, typicality is not met. Those defenses relate to the plaintiff's inability to recall certain wireless numbers, whether she gave consent, and the fact that she does not pay the bill for her current phone number.

The defendant's argument is both confusing and misapprehends typicality. Namely, the defendant offers no explanation why the purported defenses it will raise against the plaintiff are unique to her only and will not be typical of the class. Conversely, the Court finds that it is eminently likely that the defenses the defendant references will be typical of the class. "Typical of the class" does not mean "identical across the class," as the defendant appears to suggest. The defendant, at bottom, is really arguing that the "factual circumstances" will vary across the class. This is, of course, largely inevitable in class litigation and is largely irrelevant unless the plaintiff's claims and defenses are so unique—because of these factual distinctions—that the plaintiff's interest are not aligned with the interests of

the class. The Court finds nothing to suggest that is the case, here. Thus, the Court finds the typicality requirement has been met.

### 3.3.4 Adequacy

Adequacy is not contested by the parties, so the Court need not delve much into this requirement. There is no evidence before the Court that the plaintiff's credibility is at issue, that conflicts exist between the plaintiff and potential class members, or that class counsel is inadequate. To the extent that the defendant implies that the plaintiff lacks credibility because she cannot remember some of her phone numbers or has given inconsistent testimony, the Court finds that implication unpersuasive. *See Birchmeir,* 2014 WL 3907048, at *10 ("There is no requirement for a class representative to research or keep notes on her claims, nor do defendants cite a case suggesting such a requirement."); *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 728 (7th Cir. 2011) (stating that "[f]or an assault on the class representative's credibility to succeed, [a party] must demonstrate that there exists admissible evidence so severely undermining the plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of absent class members' claims"). Therefore, the Court finds the adequacy requirement has been met.

### 3.3.5 Predominance

While the plaintiff has attempted to identify the common questions across the class, which are noted above, the Court finds it necessary to clarify a few points. First, while the plaintiff poses four common questions, the first two questions essentially ask the same thing: did the autodialed calls to putative class members violate the TCPA because the class members could not, or did not, provide prior express consent. Second, the plaintiff's last two questions are related to damages: whether the class members will be entitled

to statutory damages and, if the defendant acted willfully or knowingly, whether the class members entitled to treble damages.

To analyze predominance, the Court must key on "the substantive elements of [the plaintiff's] cause of action and inquire into the proof necessary for the various elements." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981). The elements of the TCPA claims alleged are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; and (3) without the recipient's prior express consent. 47 U.S.C. 227 § (b)(1)(A). As noted above, prior express consent in the debt-collection context requires that the creditor prove that the called number was provided during the transaction that resulted in the debt owed.

First, resolution of the first element, that the class members were called by TDAF, requires no individualized proof. It is a common question because TDAF's records are sufficient to establish this element of the class's TCPA claim. Indeed, during discovery the autodialed call list was provided and then winnowed down by the plaintiff to only cell phone numbers. Second, TDAF concedes that all of the calls during the class period were made using an autodialer, so no proof is necessary on that issue. Third, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815. Thus, while damages may be an individual question, the issue is unlikely to predominate because of the common course of conduct across the class. Fourth, despite the defendant's arguments to the contrary, answering whether TDAF's conduct was willful is not an individual question. TDAF has conceded that it has policies and procedures in place that govern its interactions with individuals who are in its CASS system. There is no evidence before the Court that TDAF "acted differently with respect to different proposed class members, [thus] the 'willfullness' claim will…

depend on defendant's general practices or procedures, or lack thereof, which is entirely suitable for class determination." *Zyburo*, 2014 WL 4536932, at *3.

Accordingly, the remaining question before the Court is whether the individual question of prior express consent will predominate over the issues common to the class. Whether the predominance requirement can be met is often outcome determinative in TCPA litigation. *See Jamison*, 290 F.R.D. at 106 (collecting cases and noting the "split of opinion in TCPA cases on whether issues of individualized consent predominate over common questions of law or fact so as to prevent class certification"). Thus, when prior express consent is at issue, predominance "primarily turns on whether a class-based trial on the merits could actually be administered," *Connelly*, 294 F.R.D. at 577, or whether the case will devolve into myriad mini-trials on each class member's claim. *See Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 238 (S.D. Ill. Mar. 11, 2011) (finding individual consent issue would predominate "burden[ing] the Court and the litigants with the arduous task of sifting through each putative class member's claim to determine its merits on a case-by-case basis").

Turning to the instant case, the Court finds it possible—indeed likely— that determining whether members of the class provided prior express consent would involve individualized inquiries. This is an inevitable consequence of the Court's earlier discussion of prior express consent: namely, that the Court was not convinced that a consumer could *never* consent to autodialed calls regarding another individual's debt.

Whether consent could be given, was given, or was given only in a limited fashion will—as the FCC's letter brief explained—"depend on the facts of each situation." FCC Letter Brief at 4. Consequently, these individualized inquiries could involve a review of TDAF's CASS system for

evidence of consent, testimony by the class member regarding the scope and nature of his or her communications with TDAF—including whether purported consent was circumscribed by the circumstances of the call or by the class member expressly limiting the scope, and the production of other evidence related to each class members wireless number as could be necessary. *See Connelly v. Hilton Grand Vacations, Co., LLC*, 294 F.R.D. 574, 578 (S.D. Cal. 2013) (noting that "the differing circumstances under which putative class members provided their cell phone numbers to [the defendant] are, at the very least, relevant to a determination of prior express consent").

However, the Court's determination that individual inquires into consent may be necessary does not, *ipso facto*, prove that issues of consent will predominate. The *Jamison* court suggested that "issues of individualized consent predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone," but will not predominate if a defendant "only make[s] vague assertions about consent" that lack evidentiary support.[18] *Jamison*, 209 F.R.D. at 106-107.

The defendant argues that the instant case is analogous to *Jamison*, where the court—according to the defendant, that is—"found that an affidavit of an employee demonstrating that it is common to obtain verbal consent, and to only note such numbers in unsearchable 'notes' field of

_____

[18]This rule is based, presumably, on the 2008 TCPA Order, which stated that "the burden will be on the creditor to show that it obtained the necessary prior express consent." 2008 TCPA Order ¶ 10. The Court notes that the *Jamison* predominance "rule" might impermissibly shift the burden to the *defendant* to prove that *individual questions of consent will predominate over questions common to the class.* To wit, such a rule appears to flip Rule 23(b)(3)'s predominance requirement on its head, runs afoul of voluminous precedent holding that "only plaintiffs bear the burden of satisfying Rule 23's requirements," and ignores "that a defendant is not required to present evidence to defeat class certification." *Messner*, 669 F.3d at 813, 814.

defendant's systems, was sufficient evidence that it elicited consent to call a large percentage of the potential class members." (Docket #47 at 25). However, the defendant's argument grossly misrepresents the *Jamison* court's predominance determination.

In *Jamison*, the plaintiff filed a TCPA class action against a debt-collector (working on behalf of Honda); due to limitations in Honda's databases, wireless numbers were not transferred to the debt-collector when customers defaulted. *Jamison*, 290 F.R.D. at 92-93. The court found that the debt-collector made a sufficient showing that consent would predominate by producing evidence that 1,200 of the 2,887 wireless numbers on the class list *did exist* in Honda's customer database. *Id.* at 107. Therefore, the class "could include thousands of individuals who consented to receiving calls on their cellphones" because they "likely gave their wireless number to Honda…when they filled out their credit application." *Id.* Plus, it was possible the remaining numbers existed elsewhere in Honda's database, but not in a searchable field; thus, determining consent for each class member would require a review of every member's record in Honda's database. *Id.*

Here, the defendant has not provided similar evidence that a large portion of the class consented to receiving calls on their cell phones. Indeed, the defendant refused to respond to a discovery request by the plaintiff to provide evidence of consent for any other autodialed numbers on the class list. (Docket #36 at 6 n.1). However, the Court cannot ignore: (1) that the named plaintiff's contact with TDAF involves issues of consent; (2) TDAF had a policy of asking for permission to contact individuals before placing their number in an autodialer field; (3) that plaintiff has argued that her claim is typical of the class; and (4) that TDAF may have obtained the numbers at issue under differing circumstances, *see Connelly*, 294 F.R.D. at 578. Moreover, the ascertainability issues discussed above also make it more likely that

individual inquiries will be required, inevitably causing this case to devolve into a series of "mini-trials" regarding consent. These reasons effectively distinguish the instant case from those that have found individual consent issues would not predominate. *Compare Manno v. Healthcare Revenue Recovery Group, LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013) (finding consent would not predominate because "the way in which the discovery was performed weeded out the individuals who had previously contacted [the defendant] and, thus, weeded out those individuals who may have consented to be called"); *Stemple v. QC Holdings, Inc.*, No. 12-CV-01997, 2014 WL 4409817, at * 8-9 (S.D. Cal. Sept. 5, 2014) (amending class definition to eliminate consenting individuals), *with Connelly*, 294 F.R.D. at 578 (consent predominated because the defendant obtained cell phone numbers "from a variety of sources over a period of time"); *Vigus*, 274 F.R.D. at 237 (finding consent predominated because the "call list [was] not a list of homogeneously unconsenting recipients"); *Gannon v. Network Tel. Servs. Inc.*, No. 12-CV-9777, 2013 WL 2450199, at *3 (C.D. Cal. Jun. 5, 2013) (holding predominance not satisfied where consent issues required individual inquiries into class members' disparate interactions with defendant).

As articulated by the Fifth Circuit, if consent is at issue, "plaintiffs must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and it means too that district courts must only certify class actions filed under the TCPA when such a theory has been advanced." *Gene & Gene*, 541 F.3d at 329. And, the facts of each case will bear on a predominance determination regarding prior express consent. *Id.*

The plaintiff's sole reliance on the theory that no member of the class could *ever* consent effectively torpedos her ability to prove that individual

consent issues will not predominate;[19] to wit, the plaintiff foregoes any attempt to offer a "sensible method of establishing consent or the lack thereof via class-wide proof." *Id.* The only backup argument the plaintiff appears to make is that courts should not allow "potential individual merits-based defenses to determine whether a class should be certified." (Docket #56 at 13); (*see also* Docket #36 at 23) (arguing that even if consent is an individual issue, it would not defeat predominance because "[a] pure merits defense…is a matter to be determined *after* class certification, not before"). The plaintiff quotes the *Parko* case in support of this argument, where Judge Posner stated: "[h]ow many (if any) of the class members have a valid claim is the issue to be determined after the class is certified." *Parko*, 739 F.3d at 1085. While *Parko* is mostly about predominance, Judge Posner was not discussing predominance in the section the plaintiff relies on; a few sentences above the quoted language, he states that the class certification process would become unworkable if district judges were required to determine whether each member of a class "sustained an injury" and, if not, "lack standing." *Id.*

Moreover, the Court's determination that individual consent issues will predominate has nothing to do with the merits of putative class members claims. Every member of the class may ultimately prove consent was absent or none of them may. The predominance inquiry does not train on the answers to individual or class-wide questions, but whether those questions are susceptible of class-wide proof through common—as opposed

---

[19]It is worth pointing out, as well, that the plaintiff's theory that consent is absent across the class, coupled with the class definition before the Court, treads close to a fail safe class. *See Messner*, 669 F.3d at 825 (defining a fail-safe class as "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim"); *cf. Sauter v. CVS Pharmacy*, No. 13-CV-846, 2014 WL 1814076, at *4 (S.D. Ohio May 7, 2014) (collecting TCPA cases with fail-safe class definitions, including "no consent" definitions).

to individualized—evidence. *See Messner*, 669 F.3d at 818. The plaintiff has failed to prove the predominance requirement can be met.

### 3.3.6    Superiority

The plaintiff argues that this case "is a textbook example of a situation where the class action vehicle is superior." (Docket #36 at 25). According to the plaintiff, that is because the small amount of damages per plaintiff, coupled with automated calls made by the thousands, makes adjudication of individual suits inefficient and unlikely. *Id.*

The defendant argues, conversely, that the TCPA incentivizes individual claims by providing statutory damages of $500 for each negligent violations and $1500 for willful violations. (Docket #47 at 31). In addition, the defendant argues that maintaining the class action will become unmanageable because of individualized inquiries into damages.

The defendant's arguments are unavailing. With respect to the TCPA incentivizing individual suits, many courts have held otherwise and this Court agrees; as one court put it, "[f]ive hundred dollars is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action against a national corporation." *Agne v. Papa John's Int'l*, 286 F.R.D. 559, 571 (W.D. Wash. 2012). The Court rejects the defendant's second argument—an argument the defendant also used under predominance—for the reasons discussed above.

## 4.    CONCLUSION

With the benefit of the foregoing analysis, the Court is obliged to deny the plaintiff's motion for class certification. The putative class is not ascertainable and the individual issues of consent would predominate over issues common to the class. Further, because prior express consent is an individualized issue unfit for classwide resolution, certification under Rule 23(c)(4) must be denied as well.

Accordingly,

IT IS ORDERED that the plaintiff's motion for class certification (Docket #31) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the plaintiff's motion to exclude the testimony of Dr. Aron (Docket #54) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 20th day of November, 2014.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge